# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

SCOTT FRANKLIN, Derivatively on Behalf of HP INC.

**DEFENDANTS**

DION J. WEISLER, CATHERINE A. LESJAK, ENRIQUE LORES, AIDA ALVAREZ, SHUMEET BANERJI, ROBERT R. BENNETT, CHARLES BERGH, STACY BROWN-PHILPOT, STEPHANIE A. BURNS, MARY ANN CITRINO, TRACY KEOGH, STACEY MOBLEY, SUBRA SURESH, CARL BASS, RAJIV L. GUPTA, and MARGARET C. WHITMAN, and Nominal Defendant HP INC.

**(b)**   County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
Ryan M. Ernst, Bielli & Klauder, LLC
1204 N. King Street, Wilmington, DE 19801
(302) 803-4600

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|                                            | PTF | DEF |                                                                      | PTF | DEF |
|--------------------------------------------|-----|-----|----------------------------------------------------------------------|-----|-----|
| Citizen of This State                      | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State          | ☐ 4 | ☐ 4 |
| Citizen of Another State                   | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State      | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country    | ☐ 3 | ☐ 3 | Foreign Nation                                                       | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §78n(a)(1); 17 C.F.R. § 240.14a-9; 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1
Brief description of cause:
Violations by defendants of Sections 14(a) and 20(a) of the Exchange Act regarding disclosures to investors

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____   DOCKET NUMBER _____

DATE
05/17/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ryan M. Ernst

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Print          Save As...          Reset

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SCOTT FRANKLIN, Derivatively on Behalf of HP INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| DION J. WEISLER, CATHERINE A. LESJAK, ENRIQUE LORES, AIDA ALVAREZ, SHUMEET BANERJI, ROBERT R. BENNETT, CHARLES BERGH, STACY BROWN-PHILPOT, STEPHANIE A. BURNS, MARY ANNE CITRINO, TRACY KEOGH, STACEY MOBLEY, SUBRA SURESH, CARL BASS, RAJIV L. GUPTA, and MARGARET C. WHITMAN, | ) ) ) ) ) Case No. ) ) ) ) ) ) ) |
| Individual Defendants, | ) ) |
| -and- | ) ) |
| HP INC., a Delaware corporation, | ) ) |
| Nominal Defendant. | ) ) |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Scott Franklin ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

1

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant HP Inc. ("HP" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to HP's reputation, goodwill, and standing in the business community and has exposed HP to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged HP in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by HP's directors and officers from November 5, 2015 through the present (the "Relevant Period").

3.      HP provides computers, printers, and other office supplies, solutions, and services. The Company's major segments are Printing and Personal Systems. The Personal Systems Segment offers commercial and consumer PCs, workstations, mobility devices, monitors, and other related accessories, software, support, and services. The Printing Segment provides consumer and commercial printer hardware, supplies, and scanners. Within the Printing Segment is the Supplies Division.

4.      HP began operating after spinning off from Hewlett-Packard on November 1, 2015. The Supplies Division was a major source of revenue for Hewlett-Packard before the spin off and continued to be a major source of revenue for HP after the spin-off.

5.      From November 2015 through June 2016, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Supplies Division. Specifically, the division's sales practices around the world would eventually lead to an erosion in profits, but the Individual Defendants failed to disclose these sales practices and the effect they would have on the Company's future profits.

2

6.     The Individual Defendants' false and misleading statements were not fully revealed until September 30, 2020, when the SEC issued a cease-and-desist order to HP pursuant to section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 (the "Order").[1] The Order noted that HP failed to disclose that: (1) the Company calculated Weeks of Supply ("WOS") by excluding Tier 2 Channel Partners; (2) the Supplies Division offered additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) sales managers pulled sales forward during the end of a quarter by offering steep discounts; and (4) sales managers from different regions failed to stay within their territories, thus cannibalizing sales from other regions. Together, these practices created a snowball effect of Supplies Division sales managers flooding the channel inventory, eventually causing lower profits in future quarters.

7.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact issued regarding these material business practices during the Relevant Period. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

8.     As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California styled *York County On Behalf Of The County Of York Retirement Fund v. HP Inc. et al.*, Case No. 4:20-cv-07835-JSW, (the "Federal Securities Class Action"), HP's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

---

[1] *See* Order,
https://www.sec.gov/litigation/admin/2020/33-10868.pdf.

## JURISDICTION AND VENUE

9.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.       This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

11.       This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

12.       Venue is proper in this District because the Company is incorporated in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

13.       Plaintiff Scott Franklin is and has continuously been a stockholder of HP during the wrongdoing complained of herein.

### Nominal Defendant

14.       Defendant HP is a Delaware corporation with its principal executive offices at 1501 Page Mill Road, Palo Alto, California 94304. HP's shares trade on the New York Stock Exchange under the ticker symbol "HPQ."

**Individual Defendants**

15.     Defendant Dion J. Weisler ("Weisler") was the Company's Chief Executive Officer ("CEO") and President from November 1, 2015 until he resigned on November 1, 2019. After his resignation, Defendant Weisler continued to serve as a director until May 12, 2020 when, at the 2020 Annual Meeting of Stockholders, he was not nominated for re-election. For the fiscal year ended October 31, 2018, Weisler received $19,215,534 in total compensation from the Company. During the Relevant Period, Weisler made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| September 25, 2017 | 95,521 | $19.97 | $1,907,554 |
| October 13, 2017 | 525,719 | $20.97 | $11,024,327 |
| November 2, 2017 | 525,719 | $21.22 | $11,155,757 |
| November 6, 2017 | 80,102 | $21.46 | $1,718,988 |
| November 6, 2018 | 7,399 | $24.55 | $181,645 |
| November 7, 2018 | 78,990 | $24.82 | $1,960,531 |
| December 11, 2018 | 116,134 | $22.98 | $2,668,759 |
| March 18, 2019 | 36,799 | $20 | $735,980 |
| June 27, 2019 | 132,964 | $20.95 | $2,785,595 |
| August 26, 2019 | 437,171 | $18.01 | $7,873,449 |
| Total Proceeds: | | | $42,012,585 |

16.     Defendant Catherine A. Lesjak ("Lesjak") served as the Company's Chief Financial Officer ("CFO") from November 1, 2015 until June 30, 2018. For the fiscal year ended October 31, 2018, Lesjak received $7,844,256 in total compensation from the Company. During

the Relevant Period, Lesjak made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| March 17, 2016 | 18,580 | $11.96 | $222,216 |
| March 18, 2016 | 305,730 | $11.96 | $3,656,530 |
| April 3, 2017 | 719,775 | $17.59 | $12,660,842 |
| April 12, 2017 | 120,000 | $18.14 | $2,176,800 |
| May 1, 2017 | 67,997 | $19 | $1,291,943 |
| May 2, 2017 | 52,387 | $19 | $995,353 |
| October 1, 2018 | 693,594 | $25.78 | $17,880,853 |
| Total Proceeds: | | | $38,884,537 |

17.     Defendant Enrique Lores ("Lores") has been the Company's CEO and a director since November 1, 2019. For the fiscal year ended October 31, 2020, he received $12,479,815 in total compensation from the Company. Prior to November 1, 2019, Lores served as HP's President of Imaging & Printing during the Relevant Period. During the Relevant Period, Lores made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| November 25, 2016 | 3,165 | $14.84 | $46,968 |
| December 12, 2016 | 980 | $15.17 | $14,866 |
| May 31, 2017 | 59,000 | $18.80 | $1,109,200 |
| October 6, 2017 | 40,965 | $20.50 | $839,782 |
| October 13, 2017 | 40,965 | $21.50 | $880,747 |

| January 12, 2018 | 37,820 | $22.49 | $850,571 |
| January 17, 2018 | 53,484 | $22.49 | $1,202,855 |
| January 18, 2018 | 249,409 | $23.49 | $5,858,617 |
| March 9, 2018 | 302,895 | $24.49 | $7,417,898 |
| Total Proceeds: | | | $18,221,504 |

18.     Defendant Tracy S. Keogh ("Keogh") has served as the Company's Chief Human Resources Officer since November 1, 2015. During the Relevant Period, Keogh made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| May 27, 2016 | 200,000 | $13.13 | $2,626,000 |
| July 19, 2016 | 100,000 | $14 | $1,400,000 |
| August 15, 2016 | 100,000 | $14.50 | $1,450,000 |
| September 22, 2016 | 100,000 | $15 | $1,500,000 |
| February 24, 2017 | 113,582 | $17.43 | $1,979,734 |
| September 27, 2017 | 265,600 | $19.90 | $5,285,440 |
| June 5, 2018 | 117,276 | $23 | $2,697,348 |
| June 6, 2018 | 96,926 | $23.50 | $2,277,761 |
| June 11, 2018 | 117,275 | $24 | $2,814,600 |
| February 25, 2020 | 58,638 | $23 | $1,348,674 |
| February 25, 2020 | 63,125 | $23 | $1,451,875 |
| Total Proceeds: | | | $24,831,432 |

19.     Defendant Aida Alvarez ("Alvarez") has been a Company director since February 8, 2016. For the fiscal year ended October 31, 2020, Alvarez received $311,717 in total compensation from the Company.

20.     Defendant Shumeet Banerji ("Banerji") has been a Company director since November 1, 2015. For the fiscal year ended October 31, 2020, Banerji received $331,703 in total compensation from the Company. During the Relevant Period, Banerji made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
| --- | --- | --- | --- |
| December 19, 2017 | 35,686 | $21.50 | $767,249 |
| June 10, 2019 | 28,000 | $20 | $560,000 |
| Total Proceeds: | | | $1,327,249 |

21.     Defendant Robert R. Bennett ("Bennett") has been a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Bennett received $331,703 in total compensation from the Company.

22.     Defendant Charles "Chip" V. Bergh ("Bergh") has been a director since November 1, 2015. For the fiscal year ended October 31, 2020, Bergh received $502,036 in total compensation from the Company.

23.     Defendant Stacy Brown-Philpot ("Brown-Philpot") has served as a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Brown-Philpot received $311,717 in total compensation from the Company.

24.     Defendant Stephanie A. Burns ("Burns") has served as a Company director since November 1, 2015. For fiscal year ended October 31, 2020, Burns received $336,700 in total

compensation from the Company.

25.     Defendant Mary Anne Citrino ("Citrino") has served as a Company director and Chair of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Citrino received $346,693 in total compensation from the Company.

26.     Defendant Subra Suresh ("Suresh") has served as a Company director and a member of the Audit Committee since November 1, 2015. For the fiscal year ended October 31, 2020, Suresh received $311,717 in total compensation from the Company.

**Former Directors**

27.     Defendant Carl Bass ("Bass") served as a Company director from November 1, 2015 until September 2017. For the fiscal year ended October 31, 2017, Bass received $310,326 in total compensation from the Company.

28.     Defendant Rajiv L. Gupta ("Gupta") served as a Company director from November 1, 2015 until April 2017. For the fiscal year ended October 31, 2017, Gupta received $67,804 in total compensation from the Company.

29.     Defendant Stacey Mobley ("Mobley") served as a Company director from November 1, 2015 until April 13, 2021. For the fiscal year ended October 31, 2020, Mobley received $311,717 in total compensation from the Company.

30.     Margaret C. Whitman ("Whitman") served as a Company director from November 1, 2015 until July 2017. For the fiscal year ended October 31, 2017, Whitman received $305,049 in total compensation from the Company. During the Relevant Period, Whitman made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
| --- | --- | --- | --- |
|  |  |  |  |

| June 20, 2017 | 73,992 | $17.72 | $1,311,138 |
| June 21, 2017 | 73,992 | $17.70 | $1,309,658 |
| June 26, 2017 | 147,968 | $18 | $2,663,424 |
| July 11, 2017 | 147,976 | $17.91 | $2,650,250 |
| July 12, 2017 | 147,976 | $18.12 | $2,681,325 |
| July 20, 2017 | 295,936 | $19 | $5,622,784 |
| July 25, 2017 | 221,960 | $19.35 | $4,294,926 |
| July 26, 2017 | 221,960 | $19.29 | $4,281,608 |
| Total Proceeds: | | | $24,815,113 |

31.     Collectively, Individual Defendants Bennett, Brown-Philpot, Burns, Citrino, and Suresh, are referred to herein as the "Audit Committee Defendants."

32.     Collectively, Individual Defendants Weisler, Lesjak, Lores, Keogh, Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Mobley, Suresh, Bass, Gupta, and Whitman, are referred to herein as the "Individual Defendants."

33.     The Individual Defendants, because of their positions with HP, possessed the power and authority to control the contents of HP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that

the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

34.     Hewlett-Packard is a technology company founded in 1939 based in the United States. On November 1, 2015, HP spun off from Hewlett-Packard and retained its ticker, HPQ, and its legacy Printing and Personal Systems businesses.

35.     HP has three segments: Personal Systems, Printing, and Corporate Investments. Of these three segments, the two major revenue creators are: Personal Systems and Printing. The Personal Systems Segment provides commercial and consumer computers and related software, support, and services. The Printing Segment consists of the Supplies Division, as well as consumer and commercial hardware. The Supplies Division sells supplies for printers, such as ink and toner.

36.     At the start of the Relevant Period, the Supplies Division was not only a major driver of HP's revenue, but was vital to the Company's success. Indeed, as Defendant Lores unambiguously explained: "We lose money on printers.  We make money on supplies."  Even today, the Supplies Division accounts for more than half of HP's net revenues in its Printing Segment.

37.     Before the spin off, Hewlett-Packard's Printing Segment's revenue had been declining for years, but the Supplies Division had high profit margins. Hewlett-Packard relied on the Supplies Division to invest in other divisions within the Printing Segment. Post spin-off, the Company became smaller, creating more responsibility for the Supplies Division to pull more than its own weight. This created pressure on managers in the Supplies Division to use improper sales techniques, including, as described further below: managers offering additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; managers pulling sales forward during the end of a quarter by offering steep discounts; and managers selling products outside of their regions.

11

These improper sales techniques made it appear that the Supplies Division was meeting its budget but would eventually backfire and reduce profit margins worldwide.

38.     During the Relevant Period, the Individual Defendants caused the Company to make materially false and misleading statements regarding HP's financial performance. The Individual Defendants gave the investing public positive financial results but did not disclose the true driver behind these temporary positive results. The Company in fact was using a flawed strategy—known as a "push model"—that would eventually decrease revenues and profits.

39.     The push model utilized a multi-tier channel but would generally only sell products directly to its "Tier 1" distributors.  The Tier 1 distributors would then sell the products through to "Tier 2" resellers, which would either sell to end users or to resellers further down the distribution chain.   Implementing the push model, HP used sales incentives to drive Supplies Division inventory to the Company's channel partners. Once inventory had pushed to channel partners, Sales Managers would use "contra" dollars, a combination of marketing spend and discounts, to: (i) promote the inventory through the channel to end users; and (ii) make sure they always met their sales targets by the end of the quarter.

40.     HP measured its channel inventory by using a calculation called WOS, which divided HP's Tier 1 channel inventory by an average of previous weeks' sales in order to give an indication of how many weeks of inventory were in the channel if sales continued at the recent pace.  The Company reported WOS as a range, which it used as a proxy for its channel health, and would disclose to the investing public whether it was within or above its internal targeted WOS range.   Internally, however, HP referred to the upper end of its WOS range as a ceiling, and regional managers were expected to keep their channel inventory below the WOS ceiling.

41.     HP's Finance Department, led by Defendant Lesjak, set the target WOS levels (*i.e.*,

channel inventory ceilings) annually, and the Company's finance team monitored WOS targets on a weekly basis using "flash" reports.  These "flash" reports compared quarterly metrics, including WOS, against HP's budget based on the actual performance of past weeks and the anticipated performance for future weeks.

42.     Moreover, although channel inventory was affected by the inventory of both Tier 1 and Tier 2 channel partners, the Individual Defendants failed to disclose that HP calculated WOS using only Tier 1 channel inventory. Excluding Tier 2 channel inventory from the WOS calculation allowed sales managers to have a higher ceiling and thus conceal the increased total channel inventory.

43.     In late 2015 and early 2016, HP's management placed increasing pressure on sales managers to stay below the WOS ceiling. Accordingly, the sales managers offered additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners. At this point the inventory channel became so flooded that Tier 2 Channel Partners requested very high discounts or refused to buy the products. This appeared to keep regions at or below their WOS ceiling, but only because Tier 2 channel inventory was not included in the calculation. Combined with the steeper discounts, this strategy continued to flood the channel inventory which would ultimately reduce future revenue. Furthermore, some sales managers within the Printing Segment pulled sales forward from future quarters by offering high discounts on products at the end of a quarter.

44.     HP conducted business in three regions: the Americas ("AMS"), Asia Pacific and Japan ("APJ"), and Europe Middle East Africa ("EMEA"). From 2015 through June 2016, some APJ sales managers sold to resellers outside the APJ territory with higher-than-normal discounts. When APJ managers sold products in the EMEA territory, it caused a chain reaction which ended with EMEA sales managers invading the AMS territory. This cannibalization of sales further

increased the channel inventory, but the Individual Defendants failed to disclose this practice to the market.

## The Individual Defendants' False and Misleading Statements

### *November 5, 2015 8-K*

45.     On November 5, 2015, after the market closed, the Company filed a Form 8-K with the SEC, which incorporated by reference the consolidated financial statements, accompanying notes, and Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") from the Form 10-Q for the third quarter of fiscal 2015 ("Q3 2015"), ended July 31, 2015.

46.     The Company's "[g]ross margin was 23.8%…and 24% for the three months ended July 31, 2015 and 2014, respectively." The Company claimed that the 0.2 percentage point decrease in gross margin was "due primarily to competitive pricing pressures[.]" For the nine months ended July 31, 2015, the Company's gross margin was "23.7%[.]" The Printing Segment's net revenue for the nine months ended July 31, 2015 was $16.1 billion. The Supplies Division's net revenue was responsible for $10.7 billion of the $16.1 billion.

### *November 24, 2015 Press Release and Earnings Call*

47.     On November 24, 2015, HP issued a press release discussing earnings results for the fourth quarter and full fiscal year ended October 31, 2015. The Company reported that, for the fourth quarter, the Printing Segment's net revenue was approximately $5 billion with an operating margin of 17.4%, and the Supplies Division's net revenue was approximately $3.2 billion. For the fiscal year ended October 31, 2015, the Company reported Printing Segment net revenue of $21.2 billion and Supplies Division net revenue of $13.9 billion.

48.     That same day, the Company held an earnings call. Defendant Weisler stated that the Company expected "stabilization in ink supplies revenue to be delayed towards the end of

2017[.]" He pointed out that the Company was continuing to "make sure [their] channel inventory…is well under control." During the same call, Defendant Lesjak stated that, "[f]rom a channel inventory perspective, we've reduced both hardware and supplies levels year-over-year and sequentially, but we are still slightly above target weeks of supply range for supplies."

49.     Following the release of the fourth quarter and fiscal year 2015 results, HP's stock price declined 14% to a closing price of $12.64 per share on November 25, 2015. Weisler's and Lesjak's false positive statements about the Supplies Division and their failure to disclose the improper channel inventory business practices kept the stock from declining further.

***December 16, 2015 10-K***

50.     On December 16, 2015, HP filed its annual report on Form 10-K for the fiscal year ending October 31, 2015 (the "2015 10-K"). The 2015 10-K reported Printing Segment net revenue of $21.2 billion, a decrease of 8.5% year-over-year, and stated that the decrease was "due primarily to unfavorable currency impacts, weak market demand and competitive pricing measures[.]"  The 2015 10-K also reported Supplies Division net revenue of $13.9 billion, representing a "decrease[] [of] 6% [year-over-year] primarily due to unfavorable currency impacts and demand weakness in toner and ink, partially offset by growth in graphics supplies."

51.     The 2015 10-K was signed by Individual Defendants Weisler, Lesjak, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Citrino, Gupta, Mobley, Suresh, and Whitman. Defendants Weisler and Lesjak also certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the information contained in the 2015 10-K "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

***January 7, 2016 Wells Fargo Report***

52.     On January 7, 2016, Wells Fargo downgraded HP stock from "Outperform" to "Market Perform[.]" The report stated: "following our meetings with management…we believe there are underappreciated aspects of HP…including its unique position in growing its managed-PC services by leveraging its managed print services[.]" The report noted that the "fiscal 2016 earnings-per-share [("EPS")] guidance of $1.59-$1.69 may still be achievable," but that it would come with a "higher execution risk." Thus, Wells Fargo lowered its EPS estimate for fiscal 2016 from $1.65 to $1.61.

53.     Following the release of the Wells Fargo analyst report, the price of HP stock declined 4.6% to close of $10.77 per share on January 7, 2016.

***February 24, 2016 Press Release and Earnings Call***

54.     As the price of HP stock began to decline, the plot to keep the Supplies Division under the WOS ceiling and to increase the channel inventory continued. On February 24, 2016, the Company issued a press release disclosing financial results for the first quarter of fiscal 2016 ended January 31, 2016 ("1Q 2016"). The press release quoted Defendant Weisler: "We have a clear strategy that leverages our strengths, and we are focused on execution, taking cost out of the business and delivering innovations that will amaze our customers and partners[.]" Supplies Division revenue was down 14% with a net revenue of $3.1 billion for 1Q 2016.

55.     On the same day, the Company held an earnings call for analysts and investors. During the earnings call, Defendant Weisler stated, in relevant part:

> Shifting to supplies. The year-over-year revenue was down 8% in constant currency. The factors driving the decline that were expected going into the quarter were installed-base erosion from declining hardware sales and channel inventory adjustments. The factors that varied from our plan where pricing and aftermarket share. Supplies pricing was up, given adjustments we made to offset some of the unfavorable currency, but not as much as planned given necessary discounting in the quarter to combat aftermarket alternatives. Our aftermarket share was more pressured than expected for toner.

16

56.     Defendant Lesjak reported Printing Segment net revenue of $4.6 billion and Printing Segment operating profit margin of 17%. She further stated, in relevant part:

> Supplies channel inventory was slightly above the range…
>
> ***
>
> Our reported supplies revenue is expected to decline double digits year over year, which is incorporated in our outlook of the stabilization in constant currency by the end of 2017.
>
> ***
>
> And then **from a channel inventory perspective** on the hardware side, we are in a very healthy position. And so there shouldn't be any more channel inventory hardware units adjusted, that need to be adjusted. **On the supply side, we are still slightly above our kind of targeted range.** And so we do need some additional channel inventory correction in Q2, but we will be through that in – by the end of the first half.
>
> ***
>
> **On the Printing side**, really, the margin – so we delivered a margin of 17%, down 1.8 points. **And the pressure there was really around a very competitive pricing environment related to currency and then also just the strength of the dollar from a currency perspective that was a bigger headwind than the tailwind from supplies** – favorable supplies and hardware mix. And they also had struggled with – or we also struggled with lots of operating expense leverage there, again, back to the fact that we've got to get our cost structure, our nonrevenue-generating cost structure down to operate in what we're calling the new normal. This is the environment in which we have to win and succeed.

(Emphasis added).

57.     Following the press release and earnings call, HP's stock price declined 4.4% to close at $10.34 per share on February 25, 2016. Weisler's and Lesjak's positive statements about the outlook for the Supplies Division and their failure to disclose the overflowing channel inventory due to sales practices unknown to the public kept the stock from declining further. For instance, Defendant Lesjak represented on the earnings call that the correction in channel inventory

17

would be completed "by the end of the first half" of the second quarter and stated that the Supplies Division "made solid progress on [its] core and growth initiatives."

***March 1, 2016 Morgan Stanley Conference***

58.     On March 1, 2016, Defendant Lesjak attended the Morgan Stanley Technology, Media & Telecom Conference. Lesjak stated, in relevant part:

> The other assumption is that from a print perspective, specifically around supplies, in the first half, **we are taking fairly significant channel inventory corrections and those we do not expect to repeat in the second half**, which changes the constant currency kind of revenue growth trajectory of supplies in the back half as well. And so those are the -- and then you've got the productivity initiatives that build over the course of the year and then these revenue -- nonrevenue-generating cost structure reductions also build over the course of the year, and that leads to a fairly back-end loaded year.

(Emphasis added).

59.     An analyst from Morgan Stanley asked: "So it sounds like if the market were not to improve, you have the benefit of lower channel inventory and the product lineup, so you could see some improvement even with a stable market environment?" Lesjak responded: "Yes, it shows up basically in profitable share gains."

***March 3, 2016 10-Q***

60.     On March 3, 2016, HP filed its Form 10-Q with the SEC for the first fiscal quarter ended January 31, 2016 (the "1Q 2016 10-Q"), which showed Printing Segment net revenues of $4.6 billion and Supplies Division net revenues of $3.1 billion.

61.     The 1Q 2016 10-Q further stated, in relevant part:

> In Printing, we are experiencing the impact of demand challenges in consumer and commercial markets. **We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors, given the weakness of the Japanese yen.**

***

18

Printing net revenue decreased 17.0% (decreased 10.7% on a constant currency basis) for the three months ended January 31, 2016 as compared to the prior-year period. **The decline in net revenue was primarily driven by unfavorable currency impacts and competitive pricing pressures in part due to, weak market demand and economic slowdown.** These factors resulted in a net revenue decline across Supplies and Inkjet and LaserJet printers. **Net revenue for Supplies decreased 14% due primarily to unfavorable currency impacts, demand weakness and a competitive pricing environment.** Printer unit volume decreased 20% while the average revenue per unit ("ARU") declined 1%. Printer unit volume decreased due primarily to us driving more pricing discipline in the market, particularly in Inkjet printers, weak market demand and focus on placing higher value units. Printer ARU declined due primarily to a highly competitive pricing environment and unfavorable currency impacts in LaserJet and Inkjet printers, partially offset by a mix shift to high-value printers.

(Emphasis added).

62.     The 1Q 2016 10-Q was signed by Defendant Lesjak. Additionally, Defendants Weisler and Lesjak signed SOX certifications representing, among other things, that the 1Q 2016 10-Q "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

***May 25, 2016 Press Release and Earnings Call***

63.     On May 25, 2016, the Company issued a press release announcing its financial results for the second quarter of 2016 ended April 30, 2016. The Company reported Printing Segment net revenue of $4.6 billion and Printing Segment operating margin of 17.3%. The Supplies Division net revenue was $3 billion.

64.     On the same day, the Company held an earnings call for analysts and investors. During the earnings call, Defendant Weisler stated, in relevant part:

> **Let me also highlight that we made this progress while reducing hardware and supplies channel inventory globally.** We are now within our targeted ranges. And given our progress, we still expect our supplies revenue trajectory in constant currency to stabilize by the end of 2017.

***

Supplies trajectory improved, but it was somewhat masked by the channel inventory reductions that we had. Supplies inventory is now back within the ranges globally, and that's obviously where we want it to be.

(Emphasis added).

65.    On the same earnings call, Lesjak stated, in relevant part:

Supplies revenue was down 16% year-over-year as reported or down 10% in constant currency. Considering currency and the channel inventory position, the supplies revenue trajectory has improved. We reduced channel inventory in the quarter, which was a 7-point headwind as compared to the prior-year period. In Q2, supplies revenue mix was 67% flat sequentially and channel inventory was within our targeted range.

\*\*\*

And then, we also -- **we took our channel -- our supplies channel inventory levels down even a bit further than what we had originally intended because we believe that managing -- having a tight handle on the channel inventory levels is good for our business.**

\*\*\*

On the supplies, I think the right way to think about it is a 16% decline in supplies revenue. The fact that there was 6 points of currency, so you're down to -- down 10% constant currency, but you've got 7 points of channel inventory correction that, our belief is, you don't continue to correct channel inventory on a go-forward basis. So really, when you're looking at, I guess, we sometimes refer to as real supplies growth or decline, we're at about minus 3. **And we -- obviously, as we go through '17, we expect that, that will continue to improve so that it stabilizes by the end of '17, but again, largely in line with what we expected.**

(Emphasis added).

*June 3, 2016 10-Q*

66.    On June 3, 2016, HP filed its Form 10-Q with the SEC for the second fiscal quarter ending April 30, 2016 (the "2Q 2016 10-Q"), reporting Printing Segment net revenue of $4.6 billion and Supplies Division net revenue of $3 billion for the three months ended April 30, 2016. The 2Q 2016 10-Q further stated, in relevant part:

In Printing, we are experiencing the impact of demand challenges in consumer and

commercial markets. **We are also experiencing an overall competitive pricing environment due to aggressive pricing from our Japanese competitors.**

\*\*\*

Printing net revenue decreased 15.8% (decreased 10.3% on a constant currency basis) for the three months ended April 30, 2016 as compared to the prior-year period. The decline in net revenue was primarily driven by weak demand, unfavorable currency impacts and competitive pricing pressures. These factors resulted in a net revenue decline across Supplies and Commercial and Consumer printers. **Net revenue for Supplies decreased 16% due primarily to reduction in channel inventory, unfavorable currency impacts combined with weak market demand and a competitive pricing environment.** Printer unit volume decreased 16% while the average revenue per unit ("ARU") remained approximately flat. Printer unit volume decreased due primarily to weak market demand, our pricing discipline and focus on placing positive net present value ("NPV") units. Printer ARU remained approximately flat due primarily to favorable mix and improving ARU's on home and personal laser products, partially offset by competitive pricing in Ink in the Office and value laser products.

\*\*\*

Printing earnings from operations as a percentage of net revenue decreased by 0.5 percentage points for the three months ended April 30, 2016 as compared to the prior-year period due to a decline in gross margin and an increase in operating expenses as a percentage of net revenue. **The gross margin decline was due primarily to net unfavorable currency impacts and a competitive pricing environment**, the effects of which were partially offset by operational improvements, higher proportion of graphics supplies and favorable mix of Inkjet printers. Operating expenses as a percentage of net revenue increased due to the decline in net revenue. Printing operating expenses declined due primarily to the impact from the divestiture of certain software assets to Open Text Corporation and cost-saving initiatives.

\*\*\*

Printing net revenue decreased 16.4% (decreased 10.5% on a constant currency basis) for the six months ended April 30, 2016 as compared to the prior-year period. **The decline in net revenue was primarily driven by unfavorable currency impacts and weak market demand and competitive pricing pressures.** These factors resulted in a net revenue decline across Supplies and Commercial and Consumer printers. **Net revenue for Supplies decreased 15% due primarily to demand weakness combined with a competitive pricing environment, unfavorable currency impacts and reduction in channel inventory.** Printer unit volume decreased 18% and ARU decreased 1%. Printer unit volume decreased due to weak market demand, our pricing discipline and focus on placing positive NPV

units. Printer ARU decreased due primarily to unfavorable currency impacts and competitive pricing, partially offset by favorable mix.

(Emphasis added).

67.     Defendant Lesjak signed the 2Q 2016 10-Q. Additionally, Weisler and Lesjak signed SOX certifications, assuring investors that the 2Q 2016 10-Q "fairly presents, in all material respects, the financial condition and results of operations of HP Inc."

68.     Although the 2Q 2016 10-Q falsely claimed that the channel inventory was being reduced, the reality was that the channel inventory was being flooded. Further, the 2Q 2016 10-Q made the misleading claim that "competitive pricing" was causing net revenues to fall.

69.     Individual Defendants' representations about the Company's revenues, profits, and prospects, as set forth in paragraphs 45 – 68, *supra*, were false and misleading because they failed to disclose that the Company was: (1) calculating WOS by excluding Tier 2 Channel Partners; (2) offering additional discounts to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) pulling sales forward during the end of a quarter by offering steep discounts; and (4) cannibalizing sales because managers were selling outside their territories. Although the Individual Defendants caused the Company to artificially inflate the performance of HP's Supplies business during the Relevant Period, the truth was that HP's sales managers were flooding the channel inventory further driving down demand and creating the need for steeper discounts, which would ultimately lead to substantial losses of profits.

**The Truth Begins to Emerge**

*June 21, 2016 Earnings Call*

70.     On June 21, 2016, after the market closed, HP held a conference call for analysts and investors titled "HP Printing Update Conference Call." The purpose of the call was to update the public on the change in HP's Printing Segment sales model. Defendants Weisler and Lesjak

informed the investing public that HP would reduce Supplies Division channel inventory by $450 million and, as a result, Supplies Division net revenue would be reduced by $450 million over the third and fourth quarters of the 2016 fiscal year. The $450 million reduction would be on top of a $250 million reduction in revenue the Company took in the second fiscal quarter of 2016, amounting to a massive $700 million reduction in revenue during the course of the 2016 fiscal year.

71.     During the call, Defendant Weisler explained how the reduction in the level of supplies in the inventory channel over two quarters would ultimately shift the strategy from a "push model to a pull model driven by market demand."

72.     Defendant Lesjak claimed she was "convinced that operational change is required to manage the business differently going forward, which includes onetime investment to reduce the supplies channel inventory levels globally" and estimated that the operational impact of the reduction in channel inventory would be "$225 million in each of Q3 and Q4" of fiscal 2016.

73.     On the same conference call, Defendant Lores, then President of Imaging & Printing, stated:

> Thank you…I want to take a moment to discuss how will we manage this plan operationally. We are taking 4 actions: first, **we will reduce Tier 1 and Tier 2 supplies channel inventory levels during Q3 and Q4.** Following this onetime reduction of inventory, we will reduce and tighten the desired ranges for ink and toner in each region. **It will be critical as it is today for me to hold the sales teams accountable to remain within the ranges going forward.** You can expect us to report on this during the quarterly earning calls as we have done in the past.
>
> Second, to add further control, we will align channel compensation and programs to our market demand selling motion, and we'll shift from compensating on sell-in to a combination of sell-through and sellout volumes.
>
> Third, as Dion discussed, **we are changing our pricing policy to achieve better consistency of pricing globally.** Repricing our promotion decisions from HP supplies will now be managed centrally at the global and regional levels to align timing and to maintain our value proposition. We will reduce the frequency on

discount levels of end-user promotions and eliminate low value at channel promotions. Our Big Data capabilities give us a very good understanding of the effectiveness of our activities. Going forward, we will leverage this information to focus only on high return on investment targeted promotions. We will institute very tight controls to ensure adherence to policy and escalation processes to resolve.

Finally, by shifting some investment dollars from price promotions to end-user marketing, we will be able to demonstrate the value of HP original supply, driving loyalty and supplies share. **Taking these actions now is critical to effectively respond to the changes we are experiencing in the global market and to drive the long-term health of the Printing business.**

(Emphasis added).

74.     In response to an analyst's question regarding the magnitude of the reduction in inventory, Defendant Weisler stated as follows:

So we've done a significant amount of analysis through the collection of Big Data. We've spoken to -- at length to our channel partners. We've analyzed all areas of the business to determine what generates both -- at a Tier 1 level and a Tier 2 level, what generates market demand so that we move from this push model to a pull model. So we're fairly confident that the sums that we've talked about in the prepared remarks are the right amount of inventory to reduce in order to effect that pivoting model. I will also mention that we've spoken to a number of other organizations that operate similar business models, and we've triangulated with them as we were seeing the effects of the omnichannel impact to business in order to test some of our thinking in this space.

75.     Defendant Lesjak remarked that the reduction in inventory was "**fairly material** because, as I mentioned, **it's about $450 million over a couple of quarters here, $225 million each quarter in terms of revenue.** So it's a fairly substantial change to channel inventory." (Emphasis added).

76.     During the call, an analyst from Sanford C. Bernstein & Co., LLC posed the following questions:

I'm wondering -- I have 2 questions, why you consider the sale of the marketing organization assets as something that's attributable to non-GAAP income and why that's not excluded from your results? And then secondly, we had an earnings call less than 4 weeks ago and you said you were comfortable with supplies' inventory levels. Given all the analysis that you have done on this, **I'm surprised you said**

**that statement so unequivocally given that you're now basically coming back to us and saying that's not the right supplies channel inventory level for the new economic reality of what supplies is today.** So did you have an inkling? In which case, **why didn't you share that with us?** Or has the market changed at all in the last 4 weeks that has changed your perception of where inventory levels need to be?

(Emphasis added).

77.     Defendant Weisler responded with the following:

And on the second question, Toni, I would say that we've said that the separation would provide opportunities to optimize our business as we balance focus on short- and long-term operational decisions. And we believe this is the right thing to do now for the long-term stability and profitability of the Printing business. An operational shift towards a market-driven demand model is going to deliver lower inventories and increased efficiencies across the system, ultimately resulting in sort of greater stability and predictability in the Supplies revenue. And by reinvesting the proceeds from the divestiture now, we can accelerate the change and capitalize on the benefits sooner. We did, as you will recall on our last earnings call, take down our channel inventories last quarter. We could have done this over several quarters, but we believe that you never wish you went more slowly. And given the sale of these assets, we believe that we have the ability to capitalize on the benefits sooner. And as a result of that, we're making this decision to invest.

78.     An analyst from Wells Fargo asked:

Can you just talk about the confidence you have in the increased marketing driving sales, maybe dive a little bit deeper into that? And then the 3-year payback period on the investment is probably a little bit longer than I would have anticipated. Can you just maybe walk us through what we should be expecting over those 3 years and how the benefits flow through?

79.     Defendant Lesjak responded:

So then to specifically address your question around the 3-year payback, the payback really comes from 2 primary sources. **The first one is that with the incremental marketing and really driving sales on the basis of the value, we do expect that, over time, our share -- our HP-branded aftermarket supply share, will go up.** And that, of course, will contribute incremental margin. But it's not an immediate effect, and so it will take some time for that to ramp. **And then the second benefit is just the fact that we will be -- we will not be paying as many discount dollars to get the product into the channel and then to move it out of the channel.** And so in total, we will have lower discounts, and that also contributes to the payback. It does ramp. It ramps -- it starts to ramp in '17, which is why the absolute dollars from a supplies perspective in terms of revenue in '17 are higher

because we're taking this action. And then they are even more significantly up in 2018 because this benefit ramp.

(Emphasis added).

80.    Following the June 21, 2016 call, the price of HP stock declined 5.4% to close at $12.61 per share on June 22, 2016.

81.    Although defendants attributed the channel inventory issues and revenue and margin reductions to unfavorable currency impacts, competitive pricing, and a change in inventory modeling, they did not reveal the whole truth.

**The Truth Fully Emerges**

***September 30, 2020 SEC Order Instituting Cease and Desist Proceedings***

82.    On September 30, 2020, the SEC issued the Order, which finally revealed the extent of the Company's improper channel inventory management and sales practices. The Order focused on HP's failure to disclose "material information regarding its print supplies channel inventory management and sales practices [between] November 2015 and June 2016[.]" From November 2015 until June 2016, sales managers undertook practices which would eventually lead to "an erosion of profit margin and an increase in channel inventory[.]"

83.    Specifically, the Order focused on certain key business practices the Company failed to disclose: (1) calculating WOS by excluding Tier 2 Channel Partners; (2) the additional discounts offered to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) sales managers pulling sales forward during the end of a quarter by offering steep discounts; and (4) sales managers from different regions not staying within their territories and cannibalizing sales from other regions. Together, these practices created a snowball effect, which ultimately forced the Company to take a $700 million loss in fiscal 2016.

84.    The Order, which noted that the findings therein were "true and admitted by [HP],"

required HP to pay a $6 million civil monetary penalty and to cease and desist from committing or causing any violations of Section 17(a)(2) and (3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, 13a-15, and 12b-20 thereunder.

## The False and Misleading Proxy Statements

85.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements during the Relevant Period. There were five Form DEF14As filed with the SEC during the Relevant Period: (i) the February 19, 2016 Form DEF14A (the "2016 Proxy"); (ii) the February 17, 2017 DEF14A (the "2017 Proxy"); (iii) the February 26, 2018 DEF14A (the "2018 Proxy"); (iv) the February 26, 2019 DEF14A (the "2019 Proxy"); and (v) the March 26, 2020 DEF14A (the "2020 Proxy").[2]

86.     The 2016 Proxy, the 2017 Proxy, the 2018 Proxy, the 2019 Proxy, and the 2020 Proxy are collectively referred to herein as the "Proxies."

### *The 2016 Proxy*

87.     The 2016 Proxy recommended shareholders vote to elect Alvarez, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Gupta, Mobley, Suresh, Weisler, and Whitman. The 2016 Proxy states:

> **Stockholder Outreach**
>
> We believe that effective corporate governance should **include regular, constructive conversations with our stockholders.** Over the past year, the Board has continued to engage with stockholders both directly and through the ongoing video interview series. The Board has also sought and encouraged feedback from stockholders about our corporate governance practices by conducting additional stockholder outreach and engagement throughout the year. Our annual corporate

---

[2] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

governance investor outreach cycle is described below.

*\*\*\**

**Board Risk Oversight**

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program, which is an enterprise-wide program designed to enable effective and efficient identification of, and management visibility into, critical enterprise risks and to facilitate the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. **Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee.**

**The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.**

*\*\*\**

**We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934**, as amended (the "Exchange Act"). The Audit Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.

(Emphasis added).

88.     The 2016 Proxy did not disclose, however, that the sales practices used by the Company during the Relevant Period would eventually lead to an erosion of profits.

89.     Additionally, the 2016 Proxy contained an Audit Committee Report which stated the following, in relevant part:

**The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements**, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee). The Audit Committee has the authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.

HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting principles and the effectiveness of HP's internal control over financial reporting. **The Audit Committee monitors HP's financial reporting process and reports to the Board on its findings.**

In this context, the Audit Committee hereby reports as follows:

1. The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

2. The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public Company Accounting Oversight Board ("PCAOB").

3. The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and has discussed with the independent registered public accounting firm its independence.

4. **Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K for the**

> **fiscal year ended October 31, 2015, for filing with the Securities and Exchange Commission.**

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

(Emphasis added).

### *The 2017 Proxy*

90.     The 2017 Proxy recommended shareholders vote to elect Alvarez, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Mobley, Suresh, Weisler, and Whitman. The 2017 Proxy states:

**Stockholder Outreach**

We believe that effective corporate governance should include regular, constructive conversations with our stockholders. Over the past year, the Board has continued to engage with stockholders both directly and through the ongoing video interview series. The Board has also sought and encouraged feedback from stockholders about our corporate governance practices by conducting additional stockholder outreach and engagement throughout the year. Our annual corporate governance investor outreach cycle is described in our Annual Report available at www.hp.com/investor/home. In fiscal 2016, we met with institutional investors representing more than 25% of our outstanding stock as well as with proxy advisor firms.

***

**Board Risk Oversight**

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program, which is an enterprise-wide program designed to enable effective and efficient identification of, and management visibility into, critical enterprise risks and to facilitate the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from

various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee.

**The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.**

\*\*\*

We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). **The Audit Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.**

\*\*\*

**Code of Conduct**

We maintain a code of business conduct and ethics for directors, officers and employees known as our Standards of Business Conduct, which is available on our website at http://h30261.www3.hp.com/governance/standards-of-business-conduct.aspx.

(Emphasis added).

91.     The 2017 Proxy did not disclose to stockholders, however, the improper sales practices that would ultimately subject the Company to the scrutiny of the SEC.

92.     Additionally, the 2017 Proxy contained an Audit Committee Report which stated the following, in relevant part:

The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee). The Audit Committee has the

authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.

HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting principles and the effectiveness of HP's internal control over financial reporting. The Audit Committee monitors HP's financial reporting process and reports to the Board on its findings.

In this context, the Audit Committee hereby reports as follows:

1.  The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

2.  The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public Company Accounting Oversight Board ("PCAOB").

3.  The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and has discussed with the independent registered public accounting firm its independence.

4.  **Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K for the fiscal year ended October 31, 2016, for filing with the SEC.**

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

(Emphasis added).

**_The 2018 Proxy_**

93.     The 2018 Proxy recommended shareholders vote to elect Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Mobley, Suresh, and Weisler. The 2018 Proxy states:

**Stockholder Outreach**

We believe that effective corporate governance should include regular, constructive conversations with our stockholders. Over the past year, the Board has continued to engage with stockholders both directly and through the director video interview series. The Board has also sought and encouraged feedback from stockholders about our corporate governance practices by conducting additional stockholder outreach and engagement throughout the year. Our annual corporate governance investor outreach cycle is described in our Annual Report available at www.hp.com/investor/home. In fiscal 2017, we met with institutional investors representing more than 25% of our outstanding stock as well as with proxy advisor firms.

*\*\**

**Board Risk Oversight**

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program. This enterprise-wide program is designed to enable effective and efficient identification of, and management's visibility into, critical enterprise risks. It also facilitates the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee.

**The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.**

*\*\**

We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). **The Audit**

> **Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.**
>
> ***
>
> **Code of Conduct**
>
> We maintain a code of business conduct and ethics for directors, officers and employees known as our Standards of Business Conduct, which is available on our website at http://h30261.www3.hp.com/governance/standards-of-business-conduct.aspx. If the Board grants any waivers from our Standards of Business Conduct to any of our directors or executive officers, or if we amend our Standards of Business Conduct, we will, if required, disclose these matters via updates to our website on a timely basis.

(Emphasis added).

94.    As with the 2016 Proxy and the 2017 Proxy, the 2018 Proxy again failed to disclose to stockholders the improper sales practices that allowed the Company to misleadingly inflate its revenue as revealed by the Order.

95.    Additionally, the 2018 Proxy contained an Audit Committee Report which stated the following, in relevant part:

> The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee) and is responsible for the audit fee negotiations associated with HP's retention of the independent registered public accounting firm. The Audit Committee has the authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.
>
> HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting

principles and the effectiveness of HP's internal control over financial reporting. The Audit Committee monitors HP's financial reporting process and reports to the Board on its findings.

In this context, the Audit Committee hereby reports as follows:

1.   The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

2.   The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public Company Accounting Oversight Board ("PCAOB").

3.   The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and has discussed with the independent registered public accounting firm its independence.

4.   **Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K/A for the fiscal year ended October 31, 2017, for filing with the SEC.**

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

(Emphasis added).

### *The 2019 Proxy*

96.   The 2019 Proxy recommended shareholders vote to elect Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Mobley, Suresh, and Weisler. The 2019 Proxy states:

**Stockholder Outreach**

We believe that effective corporate governance should include regular, constructive conversations with our stockholders. Over the past year, the Board has continued to engage with stockholders, including seeking and encouraging feedback from

35

stockholders about our corporate governance practices by conducting stockholder outreach and engagement throughout the year. Our annual corporate governance investor outreach cycle, in which the Chair of the Board, Chair of the HRC and other Directors typically participate, is outlined below.

\*\*\*

## Board Risk Oversight

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program. This enterprise-wide program is designed to enable effective and efficient identification of, and management's visibility into, critical enterprise risks. It also facilitates the incorporation of risk considerations into decision making. The ERM program is established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee.

**The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.**

\*\*\*

We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). **The Audit Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.**

\*\*\*

## Code of Conduct

We maintain a code of business conduct and ethics for Directors, officers and employees known as Integrity at HP, which is available on our website at https://investor.hp.com/governance/integrity-at-hp/default.aspx. If the Board

grants any waivers from our Standards of Business Conduct to any of our Directors or executive officers, or if we amend our Standards of Business Conduct, we will, if required, disclose these matters via updates to our website on a timely basis.

(Emphasis added).

97.     The 2019 Proxy, like the other proxy statements filed with the SEC during the Relevant Period, did not disclose to stockholders the improper sales practices referenced herein.

98.     Additionally, the 2019 Proxy contained an Audit Committee Report which stated the following, in relevant part:

The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee) and is responsible for the audit fee negotiations associated with HP's retention of the independent registered public accounting firm. The Audit Committee has the authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.

HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting principles and the effectiveness of HP's internal control over financial reporting. The Audit Committee monitors HP's financial reporting process and reports to the Board on its findings.

In this context, the Audit Committee hereby reports as follows:

1.     The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

2.     The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public

Company Accounting Oversight Board ("PCAOB").

3.    The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and has discussed with the independent registered public accounting firm its independence.

4.    **Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K for the fiscal year ended October 31, 2018, for filing with the SEC.**

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

(Emphasis added).

### *The 2020 Proxy*

99.    The 2020 Proxy recommended shareholders vote to elect Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Lores, Mobley, and Suresh. The 2020 Proxy states:

**Code of Conduct**

We maintain a code of business conduct and ethics for Directors, officers and employees known as Integrity at HP, which is available on our website at ***https://investor.hp.com/governance/integrity-at-hp/default.aspx***. If the Board grants any waivers from our Standards of Business Conduct to any of our Directors or executive officers, or if we amend our Standards of Business Conduct, we will, if required, disclose these matters via updates to our website on a timely basis.

\*\*\*

**Stockholder Outreach**

We believe that effective corporate governance should include regular, constructive conversations with our stockholders. Over the past year, the Board has continued

to engage with stockholders, including seeking and encouraging feedback from stockholders about our corporate governance practices by conducting stockholder outreach and engagement throughout the year. Our annual corporate governance investor outreach cycle, in which the Chair of the Board, Chair of the HRC Committee and other Directors typically participate, is outlined below.

100.    Additionally, the 2020 Proxy states:

**Board Risk Oversight**

The Board, with the assistance of committees of the Board as discussed below, reviews and oversees our enterprise risk management ("ERM") program. This enterprise-wide program is designed to enable effective and efficient identification of, and management's visibility into, critical enterprise risks. It also facilitates the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels and facilitate appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of our enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response efforts to senior management and to the Audit Committee.

**The Board oversees management's implementation of the ERM program, including reviewing our enterprise risk portfolio and evaluating management's approach to addressing identified risks.**

(Emphasis added).

101.    Regarding the Audit Committee, the 2020 Proxy states, in relevant part:

We have an Audit Committee established in accordance with the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). **The Audit Committee represents and assists the Board in fulfilling its responsibilities for overseeing our financial reporting processes and the audit of our financial statements.**

(Emphasis added).

102.    The 2020 Proxy also omitted to state that the Company had been improperly

39

inflating its revenues by using the sales practices referenced above.

103.    Additionally, the 2020 Proxy contained an Audit Committee Report which stated the following, in relevant part:

> The Audit Committee represents and assists the Board in fulfilling its responsibilities for general oversight of the integrity of HP's financial statements, HP's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, the performance of HP's internal audit function and independent registered public accounting firm, and risk assessment and risk management. The Audit Committee manages HP's relationship with its independent registered public accounting firm (which reports directly to the Audit Committee) and is responsible for the audit fee negotiations associated with HP's retention of the independent registered public accounting firm. The Audit Committee has the authority to obtain advice and assistance from outside legal, accounting or other advisors as the Audit Committee deems necessary to carry out its duties and receives appropriate funding, as determined by the Audit Committee, from HP for such advice and assistance.

> HP's management is primarily responsible for HP's internal control and financial reporting process. HP's independent registered public accounting firm, Ernst & Young LLP, is responsible for performing an independent audit of HP's consolidated financial statements and issuing opinions on the conformity of those audited financial statements with United States generally accepted accounting principles and the effectiveness of HP's internal control over financial reporting. The Audit Committee monitors HP's financial reporting process and reports to the Board on its findings.

> In this context, the Audit Committee hereby reports as follows:

> 1.    The Audit Committee has reviewed and discussed the audited financial statements with HP's management.

> 2.    The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed under the rules adopted by the Public Company Accounting Oversight Board ("PCAOB").

> 3.    The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and has discussed

with the independent registered public accounting firm its independence.

4.      **Based on the review and discussions referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board, and the Board has approved, that the audited financial statements be included in HP's Annual Report on Form 10-K for the fiscal year ended October 31, 2019, for filing with the SEC.**

The undersigned members of the Audit Committee have submitted this Report to the Board of Directors.

(Emphasis added).

104.     The Proxies were false and misleading because, while they assured investors that the Board would reach out to stockholders and keep them informed, and that its Audit Committee reviewed filings, that was not the case as revealed by the Order. The Order clearly shows that the Individual Defendants allowed each other and the Company to issue false and materially misleading statements during the Relevant Period. The Individual Defendants also recommended shareholders re-elect directors that were in place while the improper sales practices occurred from November 2015 through June 2016.

## FIDUCIARY DUTIES

105.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe HP and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage HP in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of HP and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

106.     Each Individual Defendant owed and continues to owe HP and its stockholders the

41

fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of HP's property and assets.

107.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of HP, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with HP, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

108.    To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

- conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

- remain informed as to how HP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

- truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct**

109. The Individual Defendants, as officers and/or directors of HP, were bound by the

Company's Standards of Business Conduct, updated by the Integrity at HP policy[3] (the "Code of

Conduct") which required the following:

**Integrity at HP is a resource for all employees and members of the Board of Directors.** Integrity at HP is the new name for the Standards of Business Conduct. It represents the highest level of guidance for our conduct.

\*\*\*

Maintain high standards. When someone violates Integrity at HP, our other policies, or the law, it can result in disciplinary action, up to and including termination. Certain violations can have additional consequences under the law. All of us have a responsibility to do our part to protect our reputation and our company.

Take action when aware of misconduct. Every employee has a responsibility to report any alleged misconduct immediately. Use the HP Open Door Policy to raise concerns. Managers must encourage open and honest communication.

\*\*\*

Keep accurate records

Insist on accurate business records. Accurate records are essential to how we manage our business, maintain compliance with financial reporting regulations, and uphold credibility with both our customers and our stakeholders. Create business records that accurately reflect the truth of the underlying transaction or event. Ensure the financial policies and reporting guidelines in the Accounting and Finance Manual are followed. Where required, obtain approvals and be prepared to provide supporting documentation.

Stay alert. If accessing records is a regular part of your job, watch for any irregularities that might signal fraud, bribery, or other illegal activity, such as: false entries, discrepancies, omissions, misleading entries, or unrecorded funds. Raise a Concern about any unusual activity immediately. Employees who have questions about records should contact either the Records Information Management team or their department's Records Coordinator or Records Officer.

---

[3] *See* HP Code of Business Conduct:
https://s2.q4cdn.com/602190090/files/doc_downloads/integrity_at_hp/2020/07/HP_COC_External.pdf

Preserve materials subject to legal hold. Do not delete or destroy any records or materials that are subject to a legal hold, or relate to the subject matter of an ongoing litigation, investigation, or audit. Be sure to suspend any manual or automated practices that might lead to the deletion or destruction of any such records or materials. Employees departing HP whose records are on legal hold, or the managers of such employees, must contact the Litigation Department prior to deleting or destroying any information.

\*\*\*

**Do not trade on material non-public information**

\*\*\*

Market fairly. In talking with customers— whether in person or through our advertising, marketing, or sales materials—we provide only truthful information about our products. Do not make false or illegal claims about our competitors and never use deception or misrepresentation to gain an unfair advantage over them.

Market responsibly. We must represent our products and services fairly, accurately, and truthfully. We must not create misleading impressions in any advertising, marketing, or sales materials, or in any presentations and must not make false or illegal claims about competitors or their products and services. We protect the HP brand and marks and use them only with the proper authorization.

(Emphasis added).

110.     The Individual Defendants failed to adhere to the Code of Conduct when they failed to disclose the improper sales practices described herein.

111.     In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to HP under the Audit Committee Charter (the "Audit Charter").[4] Specifically, the Audit Charter set forth the following responsibilities of the Audit Committee Defendants:

Purpose and Authority

The purposes of the Audit Committee…are:

---

[4] *See* HP Audit Charter at:
https://s2.q4cdn.com/602190090/files/doc_downloads/board_committee/HP-Inc.-Audit-Committee-Charter.Jan-2020.pdf

a.  To represent and assist the Board in fulfilling its responsibilities for generally overseeing: (a) **HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements**, (b) HP's compliance with legal and regulatory requirements, (c) the independent registered public accounting firm's qualifications and independence, (d) the performance of HP's internal audit function and independent registered public accounting firm, and (e) risk assessment and risk management;

b.  **To prepare the audit committee report required by the proxy rules of the U.S. Securities and Exchange Commission (the "SEC") to be included in HP's annual proxy statement**…

***

Roles and Responsibilities

***

**5. Annual Audited and Quarterly Financial Statements**; Other Matters. The Committee will:

a.  Meet to review and discuss with management and the independent registered public accounting firm HP's annual audited and quarterly financial statements, including HP's disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";

b.  Review and discuss with the independent registered public accounting firm the matters required to be discussed by the independent registered public accounting firm under applicable standards adopted by the Public Company Accounting Oversight Board;

***

d.  **Review major issues regarding accounting principles and financial statement presentations**, including any significant changes in HP's selection or application of accounting principles;

e.  Review analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

6.  Inclusion of Audited Financial Statements in 10-K. **The Committee will**

**recommend to the Board whether the audited financial statements should be included in HP's Annual Report on Form 10-K**.

\*\*\*

8. Earnings Press Releases, Corporate Policies and Earnings Guidance. **The Committee will review and discuss earnings press releases (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), as well as corporate policies with respect to financial information and earnings guidance provided to analysts and ratings agencies.**

\*\*\*

10. Disclosure Controls and Procedures. **The Committee will review the adequacy and effectiveness of HP's disclosure controls and procedures**.

11. Internal Controls over Financial Reporting. The Committee will review the adequacy and effectiveness of HP's internal controls over financial reporting, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls reported by the independent registered public accounting firm, the internal auditors or management, any special audit steps adopted in light of material control deficiencies, and any fraud, whether or not material, that involves management or other HP employees who have a significant role in such controls.

\*\*\*

15. Compliance. **The Committee will oversee HP's ethics and compliance programs with respect to legal and regulatory requirements**, and review with management and the Director of Internal Audit the results of their review of compliance with applicable laws, regulations and listing standards, HP's code of conduct (known as "Integrity at HP") and internal audit reports. The Chief Ethics and Compliance Officer shall have the express authority to communicate personally to the Committee, including authority to promptly communicate personally to the Committee on any matter involving criminal conduct or potential criminal conduct. The Chief Ethics and Compliance Officer shall report to the Committee no less than annually on the implementation and effectiveness of the ethics and compliance program.

\*\*\*

18. Risks. The Committee will review risks facing HP and management's approach to addressing these risks, including significant risks or exposures relating to litigation and other proceedings and regulatory matters that may have a significant impact on HP's financial statements, and discuss policies with respect to risk assessment and risk management.

(Emphasis added).

112.    The Individual Defendants failed to adhere to the Code of Conduct by issuing false and materially misleading public statements and filings with the SEC related to the sales practices of HP's Supplies Division within its Printing Segment. Furthermore, the Audit Committee Defendants failed to perform the duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding HP's sales practices and the viability of its Printing Segment.

## BREACHES OF DUTIES

113.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of HP, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

114.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was sure to encounter because of the improper sales practices described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused HP substantial damage.

115.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee HP's public statements and internal

47

control functions.

116.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, HP has expended, and will continue to expend, significant sums of money.

## DAMAGES TO HP

117.    The improper sales practices and failure to disclose said practices have exposed the Company to myriad reputational and financial damages, including but not limited to:

- Possible restatements and goodwill impairments;

- Liability arising from the Federal Securities Class Action;

- Liability arising from the Order;

- The loss of credibility with customers and suppliers; and

- Legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively and for the benefit of HP to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of HP, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

119.    HP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has been continuously at all relevant times, a stockholder of HP. Plaintiff will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

121.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

122.    A pre-suit demand on the Board of HP is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants Lores, Alvarez, Banerji, Bennett, Bergh, Brown-Philpot, Burns, Citrino, and Suresh (the "Director Defendants"), along with Richard L. Clemmer and Judith Miscik, who are not defendants in these proceedings. Plaintiff needs only to allege demand futility as to a majority of the Directors who are on the Board at the time this action is commenced.

123.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

124.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are

not disinterested, and demand upon them is futile, and thus excused.

125.    Demand on Defendant Alvarez is futile because she has served as a Company director since 2016. She has received and continues to receive compensation for her role as a director as described herein. For these reasons, Defendant Alvarez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

126.    Demand on Defendant Banerji is futile because he has served as a Company director since November 1, 2015. He has received and continues to receive compensation for his role as a director described herein. Banerji signed and thus personally made the false and misleading statements in the 2015 10-K. Further, he received total proceeds of $1,327,249 for sales of stock during the Relevant Period. For these reasons, Defendant Banerji breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Demand on Defendant Bennett is futile because he has served as a Company director and a member of the Audit Committee since November 1, 2015. He has received and continues to receive compensation for his role as a director described herein. Bennett signed and thus personally made the false and misleading statements in the 2015 10-K. For these reasons, Defendant Bennett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Demand on Defendant Bergh is futile because he has served as a Company director since November 1, 2015. He has received and continues to receive compensation for his role as a director described herein. Bergh signed and thus personally made the false and misleading statements in the 2015 10-K. For these reasons, Defendant Bergh breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Demand on Defendant Brown-Philpot is futile because she has served as a Company director and a member of the Audit Committee since November 1, 2015. She has received and continues to receive compensation for her role as a director described herein. Brown-Philpot signed and thus personally made the false and misleading statements in the 2015 10-K. For these reasons, Defendant Brown-Philpot breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

130.    Demand on Defendant Burns is futile because she has served as a Company director since November 1, 2015. She has received and continues to receive compensation for her role as a director described herein. Burns signed and thus personally made the false and misleading statements in the 2015 10-K. For these reasons, Burns breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.    Demand on Defendant Citrino is futile because she has served as a Company director and Chair of the Audit Committee since November 1, 2015. She has received and continues to receive compensation for her role as a director described herein. Citrino signed and thus personally made the false and misleading statements in the 2015 10-K. For these reasons, Defendant Citrino breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Demand on Defendant Lores is futile because he has served as a Company director and CEO since November 1, 2019. He has received and continues to receive compensation for his

role as a director described herein. Further, the Company filed Form Def 14A with the SEC on February 22, 2021 (the "2021 Proxy"). The 2021 Proxy acknowledges that Lores is not an independent director and he is a named defendant in the Federal Securities Class Action. Lores also made the false and materially misleading statements on the June 21, 2016 conference call when he was the President of Imaging & Printing. Additionally, he received total proceeds of $18,221,504 for sales of stock during the Relevant Period. For these reasons, Defendant Lores breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.     Demand on Defendant Suresh is futile because he has served as a Company director since November 1, 2015. He has received and continues to receive compensation for his role as a director described herein. For these reasons, Defendant Suresh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

135.     The Director Defendants have longstanding business relationships with each other and the Individual Defendants, which means they cannot act independently and in the best interests of the Company. Before the spin off, Individual Defendants Banerji, Bennett, Gupta, and Whitman

52

each served as directors at Hewlett-Packard together. Prior to the spin off, Whitman served as Chairman of the Board, President, and CEO of Hewlett-Packard; Lesjak served as Executive Vice President and CFO of Hewlett-Packard; Weisler served as Executive Vice President, Printing and Personal Systems Group of Hewlett-Packard; and Keogh served as executive Vice President and Chief Human Resources Officer of Hewlett-Packard. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile.

136.   Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue materially false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

137.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest,

conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

138.    HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

139.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

140.    The acts complained of herein constitute violations of fiduciary duties owed by HP's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

141.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of HP. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage

54

for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of HP, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

142.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause HP to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

143.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least a majority of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

144.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

146.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

147.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

148.     The 2017 Proxy, 2018 Proxy, 2019 Proxy, and 2020 Proxy also stated that the Company's directors and employees are subject to the Company's Code of Conduct.  The 2017 Proxy, 2018 Proxy, 2019 Proxy, and 2020 Proxy were also false and misleading because, despite assertions to the contrary, HP's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

149.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors.

150.    The false and misleading elements of the annual Proxies led to the re-elections of Alvarez, Banerji, Bass, Bennett, Bergh, Brown-Philpot, Burns, Citrino, Gupta, Lores, Mobley, Suresh, Weisler, and Whitman, allowing them to continue breaching their fiduciary duties to HP.

151.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

152.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    The Individual Defendants, by virtue of their positions with HP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of HP and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause HP to engage in the illegal conduct and practices complained of herein.

155.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of HP's business and affairs.

158.    Each of the Individual Defendants violated and breached their fiduciary duties of

candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of HP.

160.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

161.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

162.   Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that HP was on track to flourish as a stand-alone company, yet failed to disclose major problems which included the following business practices: (1) calculating WOS by excluding Tier 2 Channel Partners; (2) the additional discounts offered to Tier 1 Channel Partners to sell to Tier 2 Channel Partners; (3) sales managers pulling sales forward during the end of a quarter by offering steep discounts; and (4) how sales managers from different regions were not staying within their territories and were cannibalizing sales. These were improper sales practices that were not disclosed to the public, which flooded the Company's channel inventory and risked future profits.

163.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

164.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

165.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

166.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, HP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of HP.

171.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from HP tied to the performance or artificially inflated valuation of HP, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

172.    Plaintiff, as a stockholder and a representative of HP, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

173.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal

investigations, and HP will lose financing from investors and business from future customers who no longer trust the Company and its products. Moreover, the Order has imposed a $6 million sanction against the Company.

176.   Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

177.   Plaintiff, on behalf of HP, has no adequate remedy at law.

## PRAYER FOR RELIEF

178.   **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of HP, and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to HP;

C.   Determining and awarding to HP the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.   Directing HP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect HP and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)   A proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Awarding HP restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: May 17, 2021                    Respectfully submitted,

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Correy A. Kamin
Ryan Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
ckamin@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Scott Franklin*